# IN THE SUPREME COURT OF IOWA

No. 20–1249

Submitted October 15, 2020—Filed October 21, 2020

**LEAGUE OF UNITED LATIN AMERICAN CITIZENS OF IOWA**
and **MAJORITY FORWARD,**

Appellants,

vs.

**IOWA SECRETARY OF STATE PAUL PATE,** In His Official Capacity**,**

Appellee.

DONALD J. TRUMP FOR PRESIDENT, INC., REPUBLICAN, NATIONAL
REPUBLICAN SENATORIAL COMMITTEE, NATIONAL REPUBLICAN
CONGRESSIONAL COMMITTEE, and REPUBLICAN PARTY OF IOWA,

Intervenors.

Appeal from the Iowa District Court for Johnson County, Lars G. Anderson, Judge.

The plaintiffs seek interlocutory review of a district court order denying a temporary injunction request challenging an absentee ballot request statute. **AFFIRMED.**

Per curiam. Oxley, J., filed a dissenting opinion in which Christensen, C.J., and Appel, J., joined.

Gary Dickey and Jamie Lynn Hunter of Dickey, Campbell & Sahag Law Firm, P.L.C., and Marc E. Elias and Christopher J. Bryant, Washington, DC; Kevin J. Hamilton, Amanda J. Beane and Nitika Arora, Seattle, WA; and Jessica R. Frenkel, Denver, CO., for appellants.

Thomas J. Miller, Attorney General, Jeffrey S. Thompson, Solicitor General, and Thomas J. Ogden and Matthew L. Gannon, Assistant Attorneys General.

Alan R. Ostergren, Des Moines, for intervenor-appellee.

Rita Bettis Austen of ACLU of Iowa Foundation, Des Moines, and Andrew M. Golodny, Elizabeth C. Arkell, and Wendy L. Wysong, Washington, DC, for amicus curiae American Civil Liberties Union of Iowa, and Celina Stewart, Washington, DC, for amicus curiae League of Women Voters of Iowa.

**PER CURIAM.**

The plaintiffs seek an expedited temporary injunction to block enforcement of a state election law. The law regulates how county auditors respond when they receive a defective absentee ballot request that contains incorrect statutorily required identification information or that omits statutorily required identification information. Under the law, county auditors must contact the applicant to obtain the required identification information. The plaintiffs contend requiring county auditors to contact the applicant to obtain the required identification information, as opposed to county auditors attempting to correct the defective requests without additional contact with the applicant, imposes a "severe burden on the right to vote" that could prevent voters from receiving and submitting ballots in time to vote in the election.

We believe that the resolution of this case is largely controlled by our decision last week in *Democratic Senatorial Campaign Committee v. Pate (DSCC v. Pate)*, ___ N.W.2d ___ (Iowa 2020) (per curiam). In that case, we upheld a state law requirement that an applicant must provide identification information (address, birthdate, and voter identification number) rather than having the identification information prefilled on forms mailed by county auditors. The state law requirement that the county auditor contact the applicant to obtain the identification information to correct the defective application is supported by the same rationale. The purpose of both requirements is to protect the integrity and security of the absentee ballot system by requiring the individual requesting an absentee ballot to provide personal identification information to verify his or her identity.

On the present record, we are not persuaded the statute imposes a significant burden on absentee voters. It is not a direct burden on voting

itself. Rather, it requires elected officials to collect identification information from the applicant to correct a defective application when the applicant attempts to obtain a ballot to vote absentee. We take judicial notice of the standard statewide absentee ballot request form, which is included as an appendix to this opinion. The form is clear as to what is required in order to complete it correctly. We also take judicial notice of current statistics, which show that, with the exception of two counties, the rate of absentee ballot requests that have not been fulfilled by county auditors is extremely low—far lower than the rate predicted by the plaintiffs. Indeed, the plaintiffs offer no evidence that the challenged statute will in fact deny any Iowan the right to vote by absentee ballot. Applying the *Anderson–Burdick* standard announced by the United States Supreme Court, we decline to set aside the state law in question for purposes of the 2020 election.

## I. Factual and Procedural Background.

This case concerns a challenge to section 124 of House File 2643 (HF 2643), passed by the legislature and signed into law in June 2020. 2020 Iowa Acts ch. 1121, § 124 (to be codified at Iowa Code § 53.2(4)(*b*) (2021)). Sections 123 and 124 of HS 2643 amended parts (*a*) and (*b*) of Iowa Code section 53.2(4) (2020). *Id.* §§ 123–124 (to be codified at Iowa Code § 53.2(4)(*a*)–(*b*) (2021)). The statute was enacted during the COVID-19 pandemic. Thus, the statute was presumably passed in anticipation of greater use of and attention to absentee balloting in the 2020 general election. *See, e.g.*, *Richardson v. Tex. Sec'y of State*, ___ F.3d ___, ___, 2020 WL 6127721, at *1 (5th Cir. Oct. 19, 2020) ("[T]he importance of electoral vigilance rises with the increase in the number of mail-in ballots, a form of voting in which 'the potential and reality of fraud is much greater . . .

than with in-person , at *voting.' " (quoting *Veasey v. Abbott,* 830 F.3d 216, 239 (5th Cir. 2016) (en banc))).

> As amended, Iowa Code section 53.2(4)(*a*) states,
>
> To request an absentee ballot, *a registered voter shall provide*:
> (1) The name and signature of the registered voter.
> (2) The registered voter's date of birth.
> (3) The address at which the voter is registered to vote.
> (4) The registered voter's voter verification number.
> (5) The name or date of the election for which the absentee ballot is requested.
> (6) Such other information as may be necessary to determine the correct absentee ballot for the registered voter.

*Id.* § 123 (to be codified at Iowa Code § 53.2(4)(*a*) (2021)) (emphasis added). Subsection (*b*), addressing situations in which "insufficient information has been provided," was amended to require county auditors to contact the applicant within twenty-four hours to obtain the required information. *Id.* § 124 (to be codified at Iowa Code § 53.2(4)(*b*) (2021). Further, the statute now forbids county auditors from using the voter registration system to complete the missing information themselves. *Id.* Under the prior statute that HF 2643 replaced, county auditors were permitted to use "the best means available" to obtain missing information, which could include the voter registration system. *Id.*

On July 14, the plaintiffs, League of United Latin American Citizens of Iowa and Majority Forward, filed a lawsuit against Iowa Secretary of State Paul Pate. The lawsuit sought to prevent Pate from enforcing the challenged portion of HF 2643. Various Republican campaign organizations filed a motion to intervene on July 24, which the district court granted.

Meanwhile, on July 17, the Secretary of State announced that a uniform statewide absentee ballot request form would be used for the

November 2020 election and arranged for it to be mailed to all registered voters in Iowa. This same form is also available on the Secretary of State's and all county auditors' websites. This one-page form provides yellow highlighting for the items ballot requesters are statutorily required to provide. It also states, conspicuously, "In order to receive an absentee ballot, a registered voter **MUST** provide the following necessary information: [listing the information required by Iowa Code section 53.2(4)(*a*)]." It also has a space for a contact email and phone number and states, conspicuously, "All voters are encouraged to provide their phone number and/or email address in the event their County Auditor needs to confirm any information on the request form."

The plaintiffs filed a request for temporary injunction on August 10. The district court set a hearing on the request for September 23. Three weeks later, the plaintiffs filed a motion requesting an earlier hearing date. The district court denied that motion and held the hearing September 23. Two days later, the district court denied the plaintiffs' request for a temporary injunction. We granted the plaintiffs' request for an interlocutory appeal on October 14.

## II. The Plaintiffs' Temporary Injunction Request.

Courts consider several factors in deciding whether to grant a temporary injunction, but both the district court in its order and the parties in their briefs focus our attention on the primary consideration in this case: A temporary injunction is available only if the party seeking the injunction can show a "likelihood of success on the merits." *Max 100 L.C. v. Iowa Realty Co.*, 621 N.W.2d 178, 181 (Iowa 2001) (en banc). This means that for a court to enter a *temporary* injunction, the parties requesting it must convince the court they have a likelihood of succeeding at the conclusion of the case after the court has heard all the evidence.

Temporary injunctions are equitable remedies that exist only to remedy legal wrongs, and if a plaintiff cannot show a likelihood of success in proving that legal wrong, there's no basis to provide a temporary remedy.

The plaintiffs assert HF 2643, by prohibiting county auditors from using voter registration databases to correct or provide the statutorily required identification information on an absentee ballot request, will cause unnecessary delays with a "cumulative result . . . that tens of thousands of Iowans will face a serious risk of losing their ability to vote absentee." The plaintiffs urge that unless we block enforcement of the law, many voters "will be unable to vote at all, either due to confusion over whether they can now vote in person having applied to vote in absentee, or because they are unable to or unwilling to during a pandemic."

The plaintiffs' prayer for relief in this case asks for "an order declaring [the relevant section of HF 2643] violates the Iowa Constitution." That is a "facial" challenge to the statute. A facial challenge asserts the law always operates unconstitutionally and not just as applied in particular circumstances. A challenge that a law is facially unconstitutional is "the most difficult . . . to mount successfully" because the challenger must show the law "is unconstitutional in all its applications." *Honomichl v. Valley View Swine, LLC*, 914 N.W.2d 223, 231 (Iowa 2018) (first quoting *United States v. Salerno*, 481 U.S. 739, 745, 107 S. Ct. 2095, 2100 (1987)). Facial challenges are disfavored because they "often rest on speculation" and

> run contrary to the fundamental principle of judicial restraint that courts should neither "anticipate a question of constitutional law in advance of the necessity of deciding it" nor "formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied."

*Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450, 128 S. Ct. 1184, 1191 (2008) (quoting *Ashwander v. Tenn. Valley Auth.*, 297 U.S. 288, 346–47, 56 S. Ct. 466, 483 (1936) (Brandeis, J., concurring)).

To evaluate a challenge to a statute impacting the right to vote, we use the balancing approach described in *Anderson v. Celebrezze*, 460 U.S. 780, 789, 103 S. Ct. 1564, 1570 (1983), and *Burdick v. Takushi*, 504 U.S. 428, 434, 112 S. Ct. 2059, 2063 (1992), which bases the rigorousness of our analysis on the extent the challenged law burdens voters' constitutional rights. *DSCC v. Pate*, ___ N.W.2d at ___. On that spectrum, strict scrutiny—the most rigorous test and the one the plaintiffs ask us to apply here—is reserved for laws that create "severe" restrictions on the right to vote. *Burdick*, 504 U.S. at 434, 112 S. Ct. at 2063–64. Conversely, when the challenged law imposes only "reasonable, nondiscriminatory restrictions" that impact voting, we apply a deferential standard of review. *Id.* (quoting *Anderson*, 560 U.S. at 788, 103 S. Ct. at 1570).

Election laws naturally impose some burdens on voters. *See Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 198, 128 S. Ct. 1610, 1621 (2008) (plurality opinion) (discussing "the usual burdens of voting"). As we just explained in *DSCC v. Pate*, requiring a voter wishing to vote absentee to provide a few items of personal information on an absentee ballot application is not much different than other burdens normally involved with voting, like the burden of going to a polling place or the burden of filling out a ballot correctly. ___ N.W.2d at ___.

In *DSCC v. Pate*, we recently upheld the requirement that *applicants* provide the identification information on the request form, not county auditors on behalf of applicants. *Id.* at ___. The rationale supporting the holding in our recent opinion applies when county auditors receive

defective request forms (i.e., ones with incomplete or incorrect information) and are required to contact the applicants instead of correcting the identification information or providing the identification information themselves. The requirements are two sides of the same coin, connected in upholding the concept that *the voter* should fill out the absentee ballot application correctly as a means of assuring the application *comes from the voter*. The plaintiffs here, in effect, seek to relieve that burden by having the auditor correct or provide the identification information. Instead, the law gives the applicant a second chance to fill out the application correctly by requiring the auditor to contact the applicant. We are not persuaded this is a severe burden.

Nor is this requirement discriminatory. All voters, regardless of any affiliation or personal characteristic, are treated the same. The statute draws no classifications, let alone any discriminatory ones. Under the balancing approach, "evenhanded restrictions that protect the integrity and reliability of the electoral process itself" are generally not considered "invidious." *DSCC v. Pate*, ___ N.W.2d at ___ (quoting *Crawford*, 553 U.S. at 189–90, 128 S. Ct. at 1616).

Against this nonsevere, nondiscriminatory burden, we balance a number of considerations. Under Iowa law, anyone can turn in an absentee ballot request on behalf of another person. *See* Iowa Code § 53.17(1)(*a*). The voter need not be the person who actually *returns* the absentee ballot request to the auditor. *Id.*; *see also id.* § 53.9 (describing who may not receive absentee ballots on behalf of voters). HF 2643 directs auditors faced with "insufficient" information on the ballot request, which might be of two types: (1) missing identification (such as a line left blank); or (2) inaccurate information provided (such as a wrong birthdate). 2020 Iowa Acts ch. 1121, § 124 (to be codified at Iowa Code § 53.2(4)(*b*) (2021)).

Both types of insufficient information raise potential concerns about whether the person completing the form is in fact the registered voter. *Missing* information raises a legitimate question of why it wasn't provided; *wrong* responses (such as listing a wrong birthdate) arguably give rise to even sharper questions of why the applicant supplied incorrect information. The auditor's direct communication with the voter furthers the integrity of absentee voting by helping to "ensure that the person submitting the request is the actual voter." *DSCC v. Pate*, ___ N.W.2d at ___.

The plaintiffs argue that because the State has provided no prior examples of fraud in absentee voting, the State's argument that HF 2643 serves to prevent fraud carries no weight. That the statute was not passed in response to evidence of actual fraud is a factor to consider, but it has little significance when, as here, the statute's burdens are so minimal. In *Crawford*, the Court analyzed—and upheld—a voter identification law in Indiana where the record showed no evidence of any actual fraud of that type had occurred in Indiana. 553 U.S. at 196, 202–03, 128 S. Ct. at 1619, 1623. Instances of voter fraud elsewhere involving absentee ballots are not unheard of. *See, e.g.*, *Pabey v. Pastrick*, 816 N.E.2d 1138, 1151 (Ind. 2004) (requiring a special election after a candidate's supporters stood near polling places and encouraged voters to vote absentee, then sought to "assist" them in filling out the ballot). Our legislature need not ignore potential threats, and "should be permitted to respond to potential deficiencies in the electoral process with foresight rather than reactively." *Munro v. Socialist Workers Party*, 479 U.S. 189, 195, 107 S. Ct. 533, 537 (1986). Reasonable minds can disagree about the most effective method for preventing voter fraud, but "the propriety of doing so is perfectly clear." *Crawford*, 553 U.S. at 196, 128 S. Ct. at 1619.

Over four decades ago, we recognized the State can lawfully regulate absentee ballot requests to prevent fraud in *Luse v. Wray*, 254 N.W.2d 324 (Iowa 1977) (en banc). In *Luse*, we examined the constitutionality of a statute regulating absentee ballots involving residents or patients in health care facilities or hospitals. *Id.* at 330. The plaintiffs challenged as unconstitutional a law that required one representative from each of the two major political parties to *personally hand deliver* an absentee ballot to a resident or patient in a health care facility or hospital during the three working days immediately prior to the election. *Id.* at 329–30. The process required by the challenged statute thus outright banned county auditors from mailing any absentee ballots to residents or patients of health care facilities or hospitals.

In analyzing the plaintiffs' facial challenge to the statute, we stated: "[W]e have no doubt that under its power to regulate voting, the legislature could impose the requirements of [the challenged law] on *all* absentee voters." *Id.* at 330 (emphasis added). We continued: "Thus the question is whether the classification of patients separately, and the treatment of them differently from other absentee voters, are valid provisions." *Id.* We considered whether the statute was subject to a rational basis or strict scrutiny test and held it did not matter; the restrictions on absentee voting in the statute "will survive application of either test." *Id.* at 331. We noted among the potential rationales supporting the statute the "prevention of fraud." *Id.*

While closely connected to the state's interest in preventing voter fraud, even measures to protect public confidence in the electoral process can, on their own, offer some justification for minimally burdensome regulations. *Crawford*, 553 U.S. at 197, 128 S. Ct. at 1620. Voting systems "cannot inspire public confidence if no safeguards exist to deter

or detect fraud." *Id.* (quoting Comm'n on Fed. Election Reform, *Building Confidence in U.S. Elections* § 2.5, at 18 (Sept. 2005), https://www.eac.gov/assets/1/6/Exhibit%20M.PDF [https://perma.cc/E9JB-G2GG]).

The absentee ballot request form is short and simple. It takes up about half of a page; on the bottom half of the page are the instructions. It states: "In order to receive an absentee ballot, a registered voter **MUST** provide the following necessary information." This statement is followed by an explanation of the necessary information (or simple restatement of it, since requests for "name," "date of birth," etc., require no explanation). Both the form itself and the instructions explain that a "Voter Verification Number" means an Iowa Driver's License (or Non-Operator ID) Number or the voter's four-digit Voter PIN on the Iowa Voter Identification Card that's mailed to voters without a driver's license or nonoperator identification. The form states that any voter may request an Iowa Voter Identification Card from the county auditor. The instructions repeat that statement in bold type: **"Any voter may request an Iowa Voter ID Card by contacting their County Auditor's Office."**

In completing the absentee ballot application form, voters are put on notice that their county auditor might need to contact them about the ballot request. The ballot application form itself spells out in clear language the request, and reason, for asking for the voter's phone and email contact information. One line on the form (marked as "Important") requests the voter's phone and email. Right next to this request, the voter can check a box that states, "Do not add this information to my voter record." The instructions provide the why: "All voters are encouraged to provide their phone number and/or email address in the event their County Auditor needs to confirm any information on the request form." It

thus alerts voters to the potential that the county auditor might need to contact them about their ballot request form.

The plaintiffs submit no evidence of anyone who has actually been thwarted from voting, let alone from voting absentee. The plaintiffs provided the affidavit of one individual who wanted to request an absentee ballot. She was currently missing her driver's license but expected to have a replacement driver's license by September 17, before the commencement of the absentee voting period. This affiant also stated that the Polk County Auditor's Office had declined to provide her with her voter ID number over the phone. We too are puzzled by this bureaucratic error, but the affiant does not indicate whether she made a second try. There is no reason to believe that, as of today, this individual does not have either a driver's license number *or* a voter ID number needed to request an absentee ballot.

The plaintiffs suggest voters who have submitted an incorrect ballot request form, but for whatever reason have not connected with the county auditor about the missing or incorrect identification information, might be confused and thus will not avail themselves of their right to vote early in person or in person on Election Day. But voters can track on the Secretary of State's website the date their absentee ballot request was received by their auditor, the date the auditor sent them a ballot, and the date the auditor received back their voted ballot. *See* Iowa Sec'y of State, *Track Your Absentee Ballot*, https://sos.iowa.gov/elections/absenteeballotstatus/absentee/search (last visited Oct. 21, 2020). This free tracking ability is available with an internet-connected computer or smartphone, a name, and a birthdate.[1] This tracking feature is easy to

---

[1]Recent data indicate that over eighty percent of adults in the United States own a smartphone. *See* Pew Rsch. Ctr., *Mobile Fact Sheet* (June 12, 2019), https://www.pewresearch.org/internet/fact-sheet/mobile/ [https://perma.cc/XGU4-

use. It compares favorably to many online "track my shipment" features that Iowans frequently access when engaging in online shopping.

The plaintiffs have cited public information from the Iowa Secretary of State's website in their brief filed Friday, October 16, and we may take judicial notice of data posted to this website. *See, e.g.*, *Ariz. Libertarian Party v. Reagan*, 798 F.3d 723, 727 n.3 (9th Cir. 2015) (taking judicial notice of information posted on a governmental website in a case challenging a voting statute); *Green Party of Ark. v. Martin*, 649 F.3d 675, 679 (8th Cir. 2011) (taking judicial notice of data on Arkansas Secretary of State website); *Arizonans for Second Chances, Rehab., & Pub. Safety v. Hobbs*, 471 P.3d 607, 614 (Ariz. 2020) (taking judicial notice of data on the Secretary of State's website in a case challenging a voting statute); *Gray v. Thomas-Barnes*, 474 S.W.3d 876, 878 (Ark. 2015) (same). The data shows that, through October 21, county auditors across the state have received 842,459 ballot requests and mailed 829,375 ballots to voters. Iowa Sec'y of State, *Absentee Ballot Statistics November 3, 2020 General Election*, [hereinafter IA SOS Absentee Ballot Statistics] (last visited Oct. 21, 2020). That means that only 1.55% of requested ballots have yet to be mailed. And since it takes some time to process a ballot request anyway, we cannot say what portion of that 1.55% is attributable to missing information that would trigger the voter contact procedures of HF 2643, or simply a function of the normal processing turnaround time for ballot requests.

But a closer look at the data reveals an even starker picture. Of the 13,084 requested ballots have yet to be mailed, 11,959 belong to just two counties: Johnson and Woodbury. *Id.* That means these two counties

---

VXNB]. The same data indicates this rate is appreciably higher for eighteen to twenty-nine-year-olds, with ninety-six percent owning smartphones. *Id.*

account for 91.40% of unfulfilled requests. It's not inconceivable the high proportion of unfulfilled requests in these two counties is due to issues associated with sending, and then needing to recall, thousands of prepopulated ballot request forms because they were issued unlawfully. *See DSCC v. Pate*, ___ N.W.2d ___ (providing background facts). If we exclude these counties in the percentage-of-ballots-yet-to-be-mailed calculation, the percentage of ballots yet to be mailed drops to fifteen-hundredths of one percent (0.15%).

Further, with only four days before the absentee ballot request deadline, the "tsunami" of absentee ballot requests that the plaintiffs' expert predicted is more accurately a trickle. Day-over-day increases in each of the last four business days totaled 17,496 (October 16), 21,282 (October 19), 20,059 (October 20), and 14,887 (October 21). IA SOS Absentee Ballot Statistics. Instead of spectacular *increases* as the deadline approaches as predicted by the plaintiffs' expert, the actual data shows daily *decreases* in ballot requests, with the most recent data showing a twenty-five percent decrease day-over-day. *Id.* And the actual percentage of yet-to-be-mailed ballots similarly *decreased* each day: 1.71% (October 16), 1.65% (October 19), 1.57% (October 20), and 1.55% (October 21). *Id.* These facts calling into question the plaintiffs' expert's predictions highlight another reason that facial challenges are disfavored, as such challenges "often rest on speculation." *Wash. State Grange*, 552 U.S. at 450, 128 S. Ct. at 1191.

Respectfully, we believe the dissent confuses several points. The dissent confuses the burden on the *voter* with the potential burden on *county auditors*. Constitutional law is concerned only with the burden on the voter. The burden on the voter, as we have explained, is simply to fill out an absentee ballot request form correctly. If the voter fails to do that,

they still have several fallbacks under the statute: (1) to respond to a county auditor's follow-up communication, (2) to vote absentee in person, or (3) to vote on election day. Courts weigh burdens on voters against the state's interests by looking at the whole electoral system. See *Burdick*, 504 U.S. at 439, 112 S. Ct. at 2066. Completing a ballot request form is the relevant burden in this case, and under our precedent, it is not a significant one. The evidence shows that hundreds of thousands of Iowa voters have already met that burden and cast their ballots in this election.

We do not discount potential burdens on county auditors. The auditors raised those concerns when HF 2643 was before the legislature. However, those are not grounds for setting aside HF 2643 now that it has been enacted into law. That some county auditors disagree with the state's required approach does not permit courts "to override the state's judgment about how public employees' time should be allocated." *Luft v. Evers*, 963 F.3d 665, 674 (7th Cir. 2020).

The dissent also confuses facts on the ground with the predictions of a party's retained expert. Both are evidence. It is well established that courts take judicial notice of voting statistics from the secretary of state in election law cases. *See Green Party of Ark. v. Martin*, 649 F.3d 675, 679 (8th Cir. 2011) (taking judicial notice of data on Arkansas Secretary of State's website). Here, those statistics actually come from state county auditors and are reported to the secretary of state. Those facts show that the predictions of the plaintiffs' expert have not come true. In part, this may be because this national expert does not understand how "absentee" in-person voting works in Iowa. Voters who cast ballots "absentee" through in-person early voting will have an in-person opportunity to correct any errors in their absentee ballot application. We place more stock in actual facts about the election (i.e., the absentee ballot request

form and the data being reported by county auditors) than the plaintiffs' before-the-event predictions.

Additionally, the dissent's repeated references to "front-end" and "back-end" confuse what is really one verification method. If every single front-end deficiency could be corrected in the back-end, the front-end would be meaningless. Under the dissent's view, a request form could contain *totally incorrect information in all respects* (wrong birthdate, wrong address, and wrong voter identification number) and the county auditor would be under a legal mandate from our court to correct everything and send out an absentee ballot. Or the form could contain only an applicant's name *and nothing more* (leaving all the other lines blank), and the auditor would be required to attempt to complete the form without contacting the named applicant and send out an absentee ballot.

What if the voter has moved and the I-Voters database no longer contains the voter's current address? Under the dissent's view, the county auditor must still send a ballot to the old address, instead of contacting the voter to clear up any issue and confirm the correct address. Again, under the dissent's view, the front-end becomes irrelevant because the auditor has to take over the voter's job and fill in everything under the back-end.

A district court's decision to grant or deny an injunction request will be overturned only if we find the district court abused the discretion it possesses on these matters. *Lewis Invs., Inc. v. City of Iowa City*, 703 N.W.2d 180, 184 (Iowa 2005). While our constitutional analysis does not entirely track the district court's analysis, we affirm the ruling for the reasons stated here.

### III. The Plaintiffs' Other Claims.

The plaintiffs also allege the statute violates the Iowa Constitution's equal protection clause. Iowa's equal protection clause "is essentially a direction that all persons similarly situated should be treated alike." *Varnum v. Brien*, 763 N.W.2d 862, 878 (Iowa 2009) (quoting *Racing Ass'n of Cent. Iowa v. Fitzgerald*, 675 N.W.2d 1, 7 (Iowa 2004)). Under this line of attack, the plaintiffs argue similarly situated voters will be treated differently because the statute establishes no deadlines about how long a county auditor may wait after emailing or calling a voter about missing information before trying to contact the voter by mail.

The plaintiffs offer no evidence that HF 2643 was intended to treat similarly situated voters differently. At some level, differences in auditor practices are inevitable. Some auditors may prefer the email contact; others the phone. In any event, variations in practices among county auditors' offices do not, without more, create an equal protection violation. *See In re Contest of Gen. Election*, 767 N.W.2d 453, 465–66 (Minn. 2009) (per curiam) (holding variations in absentee ballot procedures among local jurisdictions did not violate equal protection). Furthermore, the plaintiffs' injunction could lead to disparate treatment itself. Is the county auditor allowed to correct any erroneous information, no matter how significant the error? The plaintiffs' equal protection claims show no likelihood of success on the merits.

Finally, the plaintiffs allege the statute violates procedural due process rights under the Iowa Constitution. "Procedural due process" requires notice and an opportunity to be heard prior to depriving someone of a right or interest. *Bowers v. Polk Cnty. Bd. of Supervisors*, 638 N.W.2d 682, 691 (Iowa 2002). The plaintiffs contend voting is a fundamental right

and that the statute will result in unnecessary delay that increases the risk of disenfranchising voters.

This argument largely overlaps the discussion above, particularly as it relates to the permissible balance between election security and access to voting. But there are additional points to mention on the system's safeguards protecting the right to vote. Voters could request absentee ballots up to 120 days prior to an election. Iowa Code § 53.2(1)(*b*). The secretary of state's office mailed an absentee ballot request form to every registered voter in Iowa. *See DSCC v. Pate*, ___ N.W.2d at ___ ("Iowa is one of only eleven states where the government mailed an absentee ballot application to every registered voter." (citing Nat'l Conf. of State Legislatures, *Absentee and Mail Voting Policies in Effect for the 2020 Election* (Oct. 9, 2020))[2]). The ballot request form contains clear instructions on how to complete it. County auditors are compelled, by the very law challenged in this case, to contact voters when they receive an insufficient form, as opposed to disregarding and taking no further action on such forms. The absentee voting period began on October 5 and continues through November 2. And setting aside absentee voting, in-person early voting is also allowed during this same period.[3] On Election Day itself, polls are open from 7 a.m. until 9 p.m. The plaintiffs face too steep a climb on this record for showing a likelihood of success on the

---

[2]Available at https://www.ncsl.org/research/elections-and-campaigns/absentee-and-mail-voting-policies-in-effect-for-the-2020-election-aspx [https://perma.cc/4DFT-8DGJ].

[3]Iowa law characterizes this early in-person voting as "absentee voting" and the voter technically casts an "absentee ballot." Iowa Code §§ 53.10, .11. However, for purposes of this case, it is fundamentally different from other absentee voting because the applicant appears in person to request their absentee ballot and thus any deficiencies in the absentee ballot application can be corrected on the spot by the applicant.

merits for their due process claim based on a risk that HF 2643 will disenfranchise voters.

**IV. Conclusion.**

The United States Supreme Court has repeatedly warned that courts "should ordinarily not alter the election rules on the eve of an election." *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S. Ct. 1205, 1207 (2020) (per curiam). "Court orders affecting elections, especially conflicting orders, can themselves result in voter confusion and consequent incentive to remain away from the polls." *Purcell v. Gonzalez*, 549 U.S. 1, 4–5, 127 S. Ct. 5, 7 (2006) (per curiam).

On this record, we again decline on the eve of this election to invalidate the legislature's statute providing additional election safeguards. *See DSCC v. Pate*, ___ N.W.2d at ___. We affirm the district court's denial of the plaintiffs' temporary injunction request.

**AFFIRMED.**

This opinion shall be published.

All justices concur except Oxley, J., who files a dissenting opinion in which Christensen, C.J., and Appel, J. join.

**STATE OF IOWA OFFICIAL ABSENTEE BALLOT REQUEST FORM** DISTRICT COURT · FOR OFFICE USE ONLY

| | | |
|---|---|---|
| **YOUR NAME AND DATE OF BIRTH** | Last _____ Suffix _____ | |
| | First _____ Middle _____ | |
| | Date of Birth (month, day, year) ___ ___ / ___ ___ / ___ ___ ___ ___ | Revised July 2020 |
| **ID NUMBER** **Complete one** | Iowa Driver's License or Non-Operator ID Number: ___ ___ ___ ___ ___ ___ ___ ___ ___ **OR** Four-digit Voter PIN (found only on Voter Identification Card): ___ ___ ___ ___ | Voters who do not appear in the Iowa Dept. of Transportation's Driver's License or Non-Operator ID files are mailed an Iowa Voter Identification Card at the time of registration. Any voter may request a Voter Identification Card. |
| **YOUR IOWA RESIDENTIAL ADDRESS** | Home Street Address (include apt, lot, etc. if applicable) _____ City _____ Zip _____ County _____ You must be registered to vote in the county to receive an absentee ballot. If you are registered to vote in the county, this form will be used to update your voter registration if the information provided on this form is different than the information on your registration record. | |
| **WHERE YOUR ABSENTEE BALLOT SHOULD BE MAILED** If different than above | Mailing Address/P.O. Box _____ City _____ State _____ Zip _____ Country (other than USA) _____ | |
| **CONTACT INFO** Important | Phone _____ Email _____ | ☐ DO NOT ADD THIS INFORMATION TO MY VOTER RECORD |
| **ELECTION DATE OR TYPE** Choose only **one** election | Election Date: ___ ___ / ___ ___ / ___ ___ ___ ___ **OR** ☐ General  ☐ Primary  ☐ City/School  ☐ Special: _____ | |
| **PRIMARY ELECTION ONLY** | Check one political party  ☐ Democratic  ☐ Republican | |
| **REQUESTER AFFIDAVIT** Powers of attorney do not have legal authority to request an absentee ballot on behalf of another. | I swear or affirm that I am the person named above and I am a registered voter or I am entitled to register at the address listed on this form. I am eligible to receive and vote an absentee ballot for the election indicated above. Signature: X _____  Date _____ | |

## ABSENTEE BALLOT REQUEST FORM INSTRUCTIONS

A registered voter may make written application to their County Auditor for an absentee ballot. A written application for a mailed absentee ballot must be received by the voter's County Auditor no later than 5:00 p.m. 10 days before a General Election or 11 days before any other election.

In order to receive an absentee ballot, a registered voter **MUST** provide the following necessary information:

1. Name
2. Date of birth
3. Iowa residential address
4. Voter Verification Number (ID Number)
   - Iowa Driver's License or Non-Operator ID Number **OR**
   - Four digit Voter PIN located on the voter's Iowa Voter ID Card
   - **Any voter may request an Iowa Voter ID Card by contacting their County Auditor's Office**
5. The name **OR** date of the election for which you are requesting an absentee ballot
6. Party affiliation - only required for Primary Elections, which are held in even numbered years
7. Signature

All voters are encouraged to provide their phone number and/or email address in the event their County Auditor needs to confirm any information on the request form.

**If you have questions about absentee voting, please contact your County Auditor.**

**OXLEY, Justice, (dissenting).**

To read the majority opinion, one might forget we're even in the midst of a historic global pandemic. The majority dismisses the record evidence not only about the pandemic and its effects on county auditors' ability to keep up with record-breaking requests for absentee ballots— requests made at the urging of the defendant that voting by mail is the safest way to vote—it also dismisses the record evidence about the significant number of ballot requests county auditors will receive with missing or incorrect information. It focuses instead on the simplicity of completing the form in the first place and then tracking the form through the system, in other words, the front-end provisions at issue in our *Democratic Senatorial Campaign Committee v. Pate (DSCC v. Pate)*, ___ N.W.2d ___ (Iowa 2020) (per curiam), case.

But the majority misses the point. To begin with, this case is not about the front-end process of filling out the form correctly. It is about the back-end process of timely correcting the errors that clearly happen on a fairly large scale and getting an absentee ballot back to the voter in time to use it. The legislature has long provided a back-end process for fixing inaccurate request forms but has now made that process much more cumbersome and time-consuming as we approach a general election in which the defendant predicts eighty percent of Iowans will vote absentee. The majority does not address the record evidence that in these final days when voters are allowed to request ballots, the new back-end process will add at least seven days to the process of correcting incomplete or inaccurate request forms. The burden on voters is this delay, which will likely cause thousands of voters to not receive their ballot in time to use it.

The majority dismisses any concern over delays by citing to statistics from the Secretary of State's website purportedly showing 1.55% of requested ballots are currently waiting to be sent out, and even less if you dismiss Johnson and Woodbury Counties.[4]  But the seven-day additional delay is premised on evidence in the record that nearly 30% of requests for absentee ballots arrive in the last four days and therefore have not even

---

[4]And what do those numbers really tell us anyway?  That the total number of absentee ballots provided to voters is currently not far behind the total number of absentee ballots requested says nothing about how long it took for auditors' offices to meet those requests.  Nor does it say anything about how many of the yet-to-be-returned ballots have been on hold while election officials attempt to contact the voter.  Nor does it say anything about whether auditors' offices will be able to turn around the deluge of requests that will surely hit in the final days leading up to October 24.

Separate from what the statistics don't tell us is an accurate understanding of what the statistics do tell us.  First, it is not at all clear that deficient request forms are even included in the total number of requests.  It could very well be that counties do not consider a request to be valid until it has contacted the voter and obtained all of the correct information, so it is not at all clear that the requests at the heart of this case are even represented in the statistics relied on by the majority.  Second, it appears that the reported numbers by at least some counties include all early voting method requests, not just absentee ballot requests.  While only a handful of counties appear to make such statistics available, it appears that at least some counties are reporting all early voting methods, not just absentee mail-in ballot requests.  For example, Johnson County's total numbers include mail-in ballot requests, early in-person voting, satellite voting, and email voting requests by military and overseas Iowans.  While absentee mail-in ballots account for seventy-seven percent of the total early voting requests, they account for ninety-eight percent of the unreturned ballots.  *See Johnson Cnty. Auditor's Off., November 3, 2020 General Election Early Voting Statistics*, https://www.johnsoncountyiowa.gov/auditor/returns/2020-11-absentee Stats.htm [https://perma.cc/8QJF-86TP].

This point is supported by footnote 3 of the majority opinion, where it makes the point that early in-person voting is considered "absentee voting" under Iowa law, but that is fundamentally different from a mail-in absentee ballot because the applicant can correct any mistakes when the applicant votes early in-person.  The majority doesn't recognize the same point when it uses the Secretary of State's data.  In Johnson County, 15% of total requested early voting ballots were for early in-person voting, and 99.94% of them had been returned.  This shows the majority understates the percentage of nonreturned mail-in absentee ballots.  So the majority's calculations are likely not accurate in concluding that only 1.55% of absentee ballots (or .16% if you exclude Johnson and Woodbury Counties under speculation that they caused their own problems by sending prepopulated request forms) remain to be returned to voters.  Given the number of questions surrounding use of the raw data, the calculations certainly do not justify using them to entirely disregard the record evidence.

been received yet. That county auditors might be keeping up for now really doesn't prove much. It is like relying on a pail to shovel water out of a boat because it has worked so far, while watching as a tsunami wave approaches the bow. The majority's position rests on the calm before the storm.

It is not enough to say this is just the flip side of the provision we addressed in *DSCC v. Pate*. While the Code provisions address a similar purpose of protecting against fraud and ensuring election integrity, that is only one side of the scale we need to balance. The front-end and back-end provisions impose significantly different burdens on Iowa voters' ability to actually receive an absentee ballot. It is that difference in burden that, in my mind, tips the scale differently in this case than it did in *DSCC v. Pate*.

After carefully reviewing the evidence in the record about the likelihood that thousands of Iowans will not receive their requested absentee ballot in time to vote because of the cumbersome new process put in place by the legislature during the heart of the pandemic, and balancing that burden against the defendant's mere incantation of "integrity of the election system" and "voter fraud," I conclude the plaintiffs have shown a likelihood of success on the merits of their constitutional challenge to the newly enacted legislation sufficient to entitle them to the requested temporary injunction. I therefore respectfully dissent.

## I. Factual Background.

Because the majority fails to discuss much of the record evidence, I start with the factual background of how this case reached our court.

In March of this year, in the midst of the global COVID-19 pandemic, Iowa Secretary of State Paul Pate recognized that "[t]he safest way to vote will be by mail" and "encourage[d] Iowans to vote by mail in the June 2 primary to reduce the risk of spread of COVID-19." Press Release,

Off. of the Iowa Sec'y of State, *Secretary Pate to Mail Absentee Ballot Request Form to Every Registered Voter* (March 31, 2020).[5] To assist Iowans in voting by mail, Pate mailed an absentee ballot request form to every Iowan for the June 2020 primary election. *Id.* Voters heeded Pate's encouragement, and a record number of Iowans requested absentee ballots for the June 2020 primary election.

To meet the demands of record numbers of absentee ballot requests for the June primary, workers in auditors' offices statewide worked overtime and added additional staff. In Scott County, for example, staff worked fourteen straight twelve-to-fourteen-hour workdays to meet the high demand for absentee ballots. To process absentee ballot request forms, staff verified the applications against information in the I-Voters database before mailing an absentee ballot to the applicant. As has been the practice for decades, staff used the I-Voters information to correct incomplete or inaccurate request forms as long as there was sufficient information from the request form to identify the applicant.

By all accounts, the June primary was successful. Nonetheless, following the June primary, the Iowa legislature modified Iowa's law concerning absentee ballots by passing House File 2643 (HF 2643) on June 14, effective July 1. *See* 2020 Iowa Acts ch. 1121. Previously, Iowa Code section 53.2(4)(*b*) (2020) directed that election officials could use "the best means available[ to] obtain the additional necessary information" when an application was deficient. This had historically been accomplished largely by using the I-Voters database.

However, the legislature modified this subsection to require election officials to communicate directly with the applicant to obtain the missing

---

[5]Available at https://sos.iowa.gov/news/2020_03_31.html.

information before the official could mail the requested ballot. 2020 Iowa Acts ch. 1121, § 124 (to be codified at Iowa Code § 53.2(4)(*b*) (2021)). Now, election officials[6] are required to attempt to contact the registered voter by phone or email within twenty-four hours of receipt of a flawed absentee ballot request. *Id.* If the applicant can't be reached, the official must notify the registered voter of the problem by mail and await a response. *Id.* The new legislation expressly prohibits election officials from "us[ing] [the I-Voters database] to obtain additional necessary information." *Id.* The Iowa State Association of County Auditors opposed this change as unduly burdening county auditors' ability to process absentee ballot requests with no corresponding benefit.

The importance of absentee ballots has increased exponentially in the midst of the COVID-19 pandemic, especially in Iowa. That the pandemic's effect on absentee ballots is the basis for the plaintiffs' claims is made clear by the twenty-seven paragraphs and an entire section of their petition explaining how COVID-19 has exacerbated the burden HF 2643 imposes on Iowa's absentee voting system. Our state has drawn national attention for its high per capita rates of COVID-19, including provoking "dire warnings" from the CDC. Betsy Klein, *Task Force Report Shows Dire Warning to Iowa, the State with the Highest Case Rate this Week*, CNN (Sept. 1, 2020).[7] For a time, Iowa had the highest rate of new

---

[6]County auditors are the election officials with responsibility for processing absentee ballot requests. *See, e.g.*, Iowa Code § 53.2(1)(*a*) ("Any registered voter . . . may . . . apply in person for an absentee ballot at the commissioner's office or at any location designated by the commissioner."); *id.* § 53.2(1)(*b*) ("A registered voter may make written application to the commissioner for an absentee ballot."). Iowa Code section 39.3 identifies the commissioner is "the county commissioner of elections as defined in section 47.2." Section 47.2 in turn declares "[t]he county auditor of each county is designated as the county commissioner of elections in each county." *Id.* § 47.2(1). I refer to "election officials" and "county auditors" interchangeably.

[7]Available at https://edition.cnn.com/2020/09/01/politics/iowa-task-force-report-coronavirus/index.html [https://perma.cc/GF4R-7UL3].

cases among all states, *see id.*, and, as of October 21, Iowa has the seventh highest rate of cases per 100,000 people. The pandemic shows no signs of easing before the general election on November 3. *Covid in the U.S.: Latest Map and Case Count*, N.Y. Times (last updated Oct. 19, 2020).[8]

Under Iowa law, an absentee ballot request form must be received by the county auditor ten days before the election. Iowa Code § 53.2(1)(*b*). With the general election on November 3, all absentee ballot request forms must be received at county auditors' offices by 5 p.m. on October 24. *See id.* The county auditor must then process the application and return it to the voter in time for the voter to get the ballot postmarked by Monday, November 2, *see* Iowa Code § 53.17(2), or delivered to the county auditor's office by the time polls close on November 3, *see* Iowa Code § 53.17(1)(*a*).

The Secretary of State predicts that eighty percent of Iowa voters will vote by absentee ballot. *See* James Lynch, *Pate Predicts 80% Absentee Voting in November*, Courier (Sept. 10, 2020).[9] "[T]he private interest of a voter being able to vote absentee is weighty, particularly in the circumstances present with this pandemic." *Democracy N.C. v. N.C. State Bd. of Elections*, ___ F. Supp. 3d ___, ___, 2020 WL 4484063, at *54 (M.D.N.C. Aug. 4, 2020) (citation omitted). Having made absentee voting available to all Iowa voters thirty years ago, and now encouraging voters to utilize absentee voting as the "safest way to vote," the state has an obligation to ensure that method of voting is actually available to its citizens. *Cf. Martin v. Kemp*, 341 F. Supp. 3d 1326, 1338 (N.D. Ga. 2018) ("Courts around the country have recognized that '[w]hile it is true that

---

[8]Available at https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html#states [https://perma.cc/7YY2-65TY].

[9]Available at https://wcfcourier.com/news/local/govt-and-politics/patepredicts-80-absentee-voting-innovember/article_52e175a1-832b-57fb-8a50-36dbbd3bc668.html [https://perma.cc/F4HK-NJVN].

absentee voting is a privilege and a convenience to voters, this does not grant the state the latitude to deprive citizens of due process with respect to the exercise of this privilege.' " (alteration in original) (quoting *Raetzel v. Parks/Bellemont Absentee Election Bd.*, 762 F. Supp. 1354, 1358 (D. Ariz. 1990))), *appeal dismissed sub nom. Martin v. Sec'y of State of Ga.*, No. 18-14503-GG, 2018 WL 7139247 (11th Cir. Dec. 11, 2018). "[O]nce the state creates an absentee voting regime, they 'must administer it in accordance with the Constitution.' " *Id.* (quoting *Zessar v. Helander*, No. 05 C 1917, 2006 WL 642646, at *6 (N.D. Ill. Mar. 13, 2006)).

That the majority reads the Secretary of State's absentee ballot statistics to show that most counties appear to currently be keeping up with getting absentee ballot requests out to voters does not minimize the burden identified in the record. Historically, over forty percent of voters in the general election request their absentee ballot in the last ten days prior to the deadline for requesting them; almost thirty percent in the final four days. The deluge is just getting started. Only time will tell if they will keep up.

With this background, I turn to the plaintiffs' claims that the July 1 amendments to section 53.2(4)(*b*) unduly burden Iowan's constitutional rights.

## II.  Standard of Review.

The majority does not dispute that the district court abused its discretion when it denied the temporary injunction by using the wrong legal standard. *See City of Des Moines v. Ogden*, 909 N.W.2d 417, 423 (Iowa 2018) ("A district court abuses its discretion" by issuing a decision that "is based on an erroneous application of the law.") (quoting *State v. Hill*, 878 N.W.2d 269, 272 (Iowa 2016)). While the majority doesn't put much stock in the differences required by the appropriate standard of

review, the district court did, beginning its order by explaining, "In this case, the standard by which the court reviews the plaintiffs' claims makes a large difference as to outcome."

"A temporary injunction is a preventive remedy to maintain the status quo of the parties prior to final judgment and to protect the subject of the litigation." *State v. Krogmann*, 804 N.W.2d 518, 523 (Iowa 2011) (quoting *Lewis Invs., Inc. v. City of Iowa City*, 703 N.W.2d 180, 184 (Iowa 2005)). The subject of the litigation is the November election, and the status quo for the plaintiffs' challenge is the state of affairs prior to the July 1 enactment of HF 2643. In deciding whether to enter a temporary injunction, courts consider the "circumstances confronting the parties and balance the harm that a temporary injunction may prevent against the harm that may result from its issuance." *Max 100 L.C. v. Iowa Realty Co.*, 621 N.W.2d 178, 181 (Iowa 2001) (en banc) (quoting *Kleman v. Charles City Police Dep't*, 373 N.W.2d 90, 96 (Iowa 1985)).

The majority appears to ignore the circumstances confronting the plaintiffs, namely the significant effect COVID-19 plays in their challenge to the statute, by asserting the plaintiffs ask us to declare section 53.2(4)(*b*) facially unconstitutional.[10] The majority then stands behind the heightened showing needed to declare a statute unconstitutional in all its applications. While plaintiffs do assert the back-end provisions of section 53.2(4)(*b*) are unduly burdensome as written, they also assert those burdens are exacerbated by the specific circumstances of the new legislation's effect on this particular election and in these unchartered times. They clearly rely on the circumstances of the pandemic to support their challenge. As such, this is not the type of facial challenge that allows

---

[10]This is the defendant's characterization of the challenge, not the plaintiffs'.

the majority to ignore what is going on around them. *Cf. Tex. Democratic Party v. Abbott*, ___ F.3d ___, ___, 2020 WL 6127049, at *4 (5th Cir. Oct. 14, 2020) (discussing whether "plaintiffs withdrew their reliance on the pandemic *and are instead making a facial challenge*," ultimately holding the district court erred in applying strict scrutiny to an equal protection challenge under the Twenty-Sixth Amendment) (emphasis added); *Pa. Democratic Party v. Boockvar*, ___ A.3d ___, ___, 2020 WL 5554644, at *16 (Pa. Sept. 17, 2020) (considering challenge to "application of the statutory language to the facts of the current unprecedented situation" as raising an as-applied rather than facial challenge to Pennsylvania's requirement that mail-in ballots be received by Election Day in light of the pandemic and mailing delays), *stay denied mem.*, ___ S. Ct. ___, 2020 WL 6128194 (Oct. 19, 2020).

I believe the majority errs when it ignores the significance of the pandemic under the guise of considering a facial challenge. This case does not require us to "formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied," *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450, 128 S. Ct. 1184, 1191 (2008) (quoting *Ashwander v. Tenn. Valley Auth.*, 297 U.S. 288, 346–47, 56 S. Ct. 466, 483 (1936) (Brandeis, J., concurring)), as suggested by the majority, but only to the "precise facts" involved in this case—which include the effects of the pandemic.

**III. The Plaintiffs Are Likely to Succeed on Their Claim that Section 124 of HF 2643 Unconstitutionally Burdens Iowans' Right to Vote During the COVID-19 Pandemic.**

I respect that policy decisions are the bailiwick of the elected branches of our state government. But the fact that election procedures

are left to state elected officials does not abdicate our responsibility, as the coequal third branch, to "jealously guard[]" Iowa citizens' constitutional rights, including their fundamental right to vote. *See DSCC v. Pate*, ___ N.W.2d at ___.

Under the *Anderson–Burdick* balancing approach, "court[s] evaluating a constitutional challenge to an election regulation weigh the asserted injury to the right to vote against the 'precise interests put forward by the State as justifications for the burden imposed by its rule,' " *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 190, 128 S. Ct. 1610, 1616 (2008) (plurality opinion) (quoting *Burdick v. Takushi*, 504 U.S. 428, 434, 112 S. Ct. 2059, 2063 (1992)), considering "the extent to which those interests make it necessary to burden the plaintiff's rights." *Burdick*, 504 U.S. at 434, 112 S. Ct. at 2063 (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 789, 103 S. Ct. 1564, 1570 (1983)). This is necessarily different from a rational basis test. While some harms may be insignificant enough that a rational basis type justification will outweigh the burden using the sliding scale approach, we must first consider the burden imposed before we can determine how much heft is required of the justification to counterbalance that burden. This is why courts do not "apply[] any 'litmus test' that would neatly separate valid from invalid restrictions" but instead "must identify and evaluate the interests put forward by the State as justifications for the burden imposed by its rule, and then make the 'hard judgment' that our adversary system demands." *Crawford*, 553 U.S. at 190, 128 S. Ct. at 1616.[11]

---

[11]It is worth noting that a careful count of votes in *Crawford* supports use of the *Anderson–Burdick* balancing test to consider the effect of the burden on a subgroup of voters rather than only considering the effect on all voters, as the majority does. In *Crawford*, "a majority of the Supreme Court agreed that in so doing, courts may consider not only a given law's impact on the electorate in general, but also its impact on subgroups, for whom the burden, when considered in context, may be more severe." *Pub.*

Here is how I weigh the burdens imposed against the state's identified interests.

**A. Prevalence of Incomplete or Incorrect Absentee Ballot Request Forms.** The crux of this dispute is the method by which a county auditor may correct deficiencies or missing information in absentee ballot request forms. Section 53.2(4)(*a*) requires an applicant to provide their name and signature, birthdate, address, and "voter verification number" when requesting an absentee ballot. Iowa Code § 53.2(4)(*a*). As explained by the President of the Iowa State Association of County Auditors, speaking on behalf of that association and with the approval of its executive board,

> [s]ome voters will invariably omit information from their Request Form, particularly the Voter ID field, which requires the voter to fill in their driver's license / non-operator ID number or their four-digit Voter PIN. This is especially true during a presidential election, which tends to draw voters less experienced with the absentee balloting process, including younger voters, and thus may be more likely to provide incomplete request forms.

County auditors who submitted declarations in support of the plaintiffs' case confirm the prevalence of incorrect or incomplete request forms. Woodbury County Auditor Patrick Gill explained that, in his experience, "many voters omit their Absentee ID Number[] or get it wrong." Gill noted that in a recent special election, over 18% of request forms left the voter ID blank, and in the June 2020 primary election, 6.5% of request

---

*Integrity All., Inc. v. City of Tucson*, 836 F.3d 1019, 1024 n.2 (9th Cir. 2016) (explaining the plurality opinion in *Crawford* recognized that election laws may disproportionately burden certain persons, but could not quantify that burden based on the evidence presented while Justice Souter's dissent found the evidence sufficient to identify disfavored subgroups)); *see also Ohio State Conf. of NAACP*, 768 F.3d at 544 ("[A] majority of the justices in *Crawford* either did not expressly reject or in fact endorsed the idea that a burden on only a subgroup of voters could trigger balancing review under *Anderson–Burdick*.").

forms mere missing the absentee ID number. Hardin County Auditor Jessica Lara explained that Hardin County received a record number of absentee ballot request forms for the June 2020 primary election, many of which had missing or incorrect voter ID numbers. Johnson County Auditor Travis Weipert explained that his "office receives request forms with missing information daily during election season."

The record supports the plaintiffs' position that submitting incomplete or incorrect information in seeking an absentee ballot is a prevalent problem during elections. The defendant does not dispute this evidence. The majority nonetheless rejects it based on its own view that the form is "short and simple."

**B. Curing the Incomplete or Incorrect Request Forms.** Prior to HF 2463, auditors' offices could use the "best means available" to correct incomplete or missing information on an absentee ballot request form. Iowa Code § 53.2(4)(*b*). For decades, the "best means available" included using the I-Voters database to supply the missing information, as long as the request form had sufficient information to otherwise identify the voter. The I-Voters database is a centralized statewide voter database developed under the Help America Vote Act of 2002. The database includes stringent security protections that secure the integrity of its information. Additions and changes to the database are continuously monitored, with weekly reports that detect any irregularities. According to Secretary Pate's office, "I-Voters is secure, and [his office] work[s] every day to ensure it remains secure." Prior to the enactment of HF 2643, the Iowa Secretary of State's Office received an award in 2019 for Iowa's efforts to promote voter security. The defendant does not dispute the accuracy or security of the information in the database.

When an election official receives an absentee ballot request form, they verify the information required under section 53.2(4)(*a*) by comparing it to the I-Voters database. Previously, when a request form had missing or inaccurate information, the election official could correct it through the I-Voters database as they verified the remaining information from the application.

The record includes evidence of the effectiveness of this method of curing defects in the request forms. Hardin County Auditor Jessica Lara testified that during the June 2020 primary election, when her office was inundated with a record number of absentee ballot request forms, the I-Voters database allowed her staff to look up the missing information and timely mail out ballots. Without the database, "contacting those voters individually would have been almost impossible," given the inundation of requests. She observed that, if the number of absentee ballot requests for the general election is anything like the primary election, her "office simply will not be able to contact all voters who omitted information on their absentee ballot requests, timely obtain the missing information from the voters individually, and then mail out ballots." Lara attested to having difficulty finding and training temporary workers for the June 2020 primary election and doubting her ability to find and train sufficient workers for the general election, particularly given the lack of funds to employ enough anticipated temporary workers to meet the requirements of HF 2643.

Additionally, Johnson County Auditor Travis Weipert explained that his "office receives Request Forms with missing information daily during election season" and sending letters rather than using the I-Voters database during the June 2020 primary election "would have taken at least 10 times longer to process the requests" and would have caused his

office to spend its limited funds on mailing letters to thousands of voters instead of other uses of those funds.

The defendant does not dispute this evidence; the majority ignores it.

**C. Burden Imposed by New Back-End Procedures.** As of July 1, county auditors must now contact the applicant by phone or email, assuming such information is available, or by letter, before any inaccuracies can be corrected and the ballot mailed to the applicant. In the abstract, requiring the county auditor to contact the applicant to supply missing or incorrect information may not appear to be much of a burden. Yet, "[h]owever slight that burden may appear, . . . it must be justified by relevant and legitimate state interests 'sufficiently weighty to justify the limitation.' " *Crawford*, 553 U.S. at 191, 128 S. Ct. at 1616 (quoting *Norman v. Reed*, 502 U.S. 279, 288–89, 112 S. Ct. 698, 705 (1992)).

Further, a proper assessment of the burden imposed by the new back-end provisions requires consideration of the context in which the burden arises. *See Ne. Ohio Coal. for the Homeless v. Husted*, 837 F.3d 612, 633 (6th Cir. 2016) (concluding Ohio's requirement for exact match of address and birthdate "collapses under scrutiny" when "none of the 'precise interests put forward by' Ohio justifies it" (quoting *Burdick*, 504 U.S. at 434, 112 S. Ct. at 2063)); *see also Pa. Democratic Party*, ___ A.3d at ___, 2020 WL 5554644, at *17 ("[T]he struggles of our most populous counties to avoid disenfranchising voters while processing the overwhelming number of pandemic-fueled mail-in ballot applications during the 2020 primary demonstrates that orderly and efficient election processes are essential to safeguarding the right to vote."); *cf. League of Women Voters of Va.*, ___ F. Supp. 3d ___, ___,

2020 WL 2158249, at *8 (W.D. Va. May 5, 2020) ("In ordinary times, Virginia's witness signature requirement may not be a significant burden on the right to vote. But these are not ordinary times. In our current era of social distancing—in which not just Virginians, but all Americans, have been instructed to maintain a minimum of six feet from those outside their household—the burden is substantial for a substantial and discrete class of Virginia's electorate.").

Professor Eitan Hersh, an expert on United States elections, explained that the key impact of HF 2643 is the additional time it adds for processing absentee ballot requests. Iowans are allowed to request an absentee ballot within ten days of the election and must either return the ballot by mail postmarked the day before the election or deliver it to the auditor's office by close of voting on Election Day. Prior to HF 2643, when county auditors were permitted to access the I-Voters database and fill in missing information, in a best-case scenario a voter who submitted a request form with missing information would have received an absentee ballot in approximately four days. However, after the changes to HF 2643, the same process would take seven additional days, such that the voter would—in the best-case scenario—instead receive the ballot in eleven days.

According to Professor Hersh, under the new back-end requirements, a voter who inadvertently makes an error or omission on her request form and submits the request even four days earlier than the allowed ten-day period leading up to the election will likely not receive the absentee ballot in sufficient time to use it to vote. This is a significant burden on voters. *See, e.g., Pa. Democratic Party,* ___ A.3d at ___, 2020 WL 5554644, at *18 (extending received-by date by three days for the return of absentee ballots, explaining: "The Legislature enacted an

extremely condensed timeline, providing only seven days between the last date to request a mail-in ballot and the last day to return a completed ballot. While it may be feasible under normal conditions, it will unquestionably fail under the strain of COVID-19 and the 2020 Presidential Election, resulting in the disenfranchisement of voters.").

How many people are we talking about? According to Professor Hersh's analysis, given the number of people who do not provide phone contact information with their request form, coupled with the number of people who do not answer a call from an unknown phone number, ninety percent of applicants who submit a deficient request form will not be reachable by phone. Thus, the vast majority of applicants who submit incomplete or inaccurate information will need to be contacted by mail.

This weeklong delay could mean the difference in a voter receiving a ballot in time to use it or not. Professor Hersh estimates 29.7% of voters who request an absentee ballot will do so within four days of the deadline, meaning approximately 369,706 people fall within the window of not receiving their ballot in time to use it if they submit the request with an error (assuming no other delays in the process).

If the same approximate number of voters fill out their request forms incorrectly for the general election as did for the primary election, between 11,100 and 33,800 Iowans who attempt to request an absentee ballot may not receive it in time to vote in the general election. Moreover, the record suggests the frequency of missing or inaccurate information provided by voters will only increase for the general election. General elections draw more voters in general, including more young and inexperienced voters. Not only are those voters more likely to be unfamiliar with the process and therefore more likely to fail to fill out a request form perfectly, they are also

more likely to be unreachable by phone to resolve errors in the request forms.  Importantly, the defendant does not dispute these observations.

The majority rejects Professor Hersh's projections based on their own calculation of purportedly current outstanding ballot requests and their conclusion that "the trend in ballot requests has flattened." This self-declared flattening is not only not supported by the cited facts, it ignores the historical evidence that approximately thirty percent of the requests are yet to come in these final four days—a trend that appears to be right on track.[12]

It is one thing to take judicial notice of "official information posted on a governmental website, the *accuracy of which is undisputed*," *Ariz. Libertarian Party v. Reagan*, 798 F.3d 723, 727 n.3 (9th Cir. 2015) (emphasis added) (quoting *Dudum v. Arntz*, 640 F.3d 1098, 1101 n.6 (9th Cir. 2011)) (taking judicial notice of the options available for individuals seeking to register to vote); *see also Arizonans for Second Chances, Rehab., & Pub. Safety v. Hobbs*, 471 P.3d 607, 614 (Ariz. 2020) (taking judicial notice of Arizona Secretary of State's website to identify the number of signatures needed to place an initiative on the upcoming ballot), or of historical data from previous election results, *see Green Party of Ark. v. Martin*, 649 F.3d 675, 679 (8th Cir. 2011) (citing statistics from Arkansas Secretary of State to explain how the Green Party failed to maintain its

---

[12]According to the numbers identified by the majority, there was a 21.6% increase (17,496 to 21,282) in requests reported between Friday and Monday morning, a 5.7% decrease (21,282 to 20,059) reported between Monday and Tuesday morning, and a 25.7% decrease (20,059 to 14,887) reported between Tuesday and Wednesday morning. This three-day fluctuation does not support the conclusion that ballot requests have flattened, or more importantly, that they will remain flattened.  The next four days will tell us if the majority's prediction is correct.  For the sake of voters making requests in these final days, I hope the majority is correct.  But it would appear that it will not be. Professor Hersh's estimate of 29.1% in the final four days seems to be on target. Assuming the majority's number is correct and 842,459 absentee ballots have been requested as of October 20—four days before the deadline—that leaves 29.8% of the defendant's estimated 1.2 million absentee requests yet to come in.

status as a political party based on the minimal votes its candidates received in prior elections); *Gray v. Thomas-Barnes*, 474 S.W.3d 876, 878 (Ark. 2015) (taking "judicial notice of *election results*" to identify the defendant, who was serving as the current mayor "as a result of having been duly elected in the November 25, 2014 run-off election" (emphasis added)). It is quite another to use daily-changing statistics from the Iowa Secretary of State's website to create factual disputes with evidence in the record for purposes of then rejecting that evidence. I am not convinced by the majority's calculations that numerous voters will not receive their absentee ballots in time to use them.

**D. State's Interest at Stake.** Against the significant—and undisputed—evidence that absentee voters frequently submit incomplete or inaccurate request forms close to the deadline and that the new back-end procedures will cause delay and put thousands of Iowans at risk of not receiving their absentee ballot in time to vote, the defendant has offered no evidence that the absentee ballot application process is prone to fraudulent misuse. The only evidence in the record is to the contrary, including Johnson County Auditor Travis Weipert's observation that he is unaware of any incident of absentee-ballot-related election fraud in Johnson County during his eight year tenure and the President of the State Association of County Auditor's declaration that the back-end changes do nothing to further that interest while significantly hampering auditors' ability to get absentee ballots to voters in time to be of any use. The state's vague justification of protecting the integrity of the election against fraud is undermined by the record evidence. *See Thomas v. Andino,* ___ F. Supp. 3d ___, ___, 2020 WL 2617329, at *19–21 (D.S.C. May 25, 2020) (finding the government's lack of evidence of voter fraud in South Carolina, other than fleeting mentions, combined with the

South Carolina Elections Commissions Director's letter stating that the witness requirement offered no benefit, undermined the strength of the state's interest in preventing voter fraud). Rather, the defendant relies on his contention that absentee voting does not implicate the fundamental right to vote, such that rational basis review applies to the plaintiffs' challenges.

The defendant's justification for changing the correction process relies on nothing more than the mere incantation of voter fraud. The state's interest is, at best, theoretical only and, even then, very slight on the record developed below. In an *Anderson–Burdick* analysis, that interest weighs very lightly on the state's interest side of the scale. *See, e.g., Fish v. Schwab*, 957 F.3d 1105, 1133 (10th Cir. 2020) (noting that the state, when asserting voter fraud, must produce evidence "that such an interest made it necessary to burden voters' rights"); *Middleton v. Andino*, ___ F. Supp. 3d ___, ___, 2020 WL 5591590, at *31 (D.S.C. Sept. 18, 2020) ("But courts are not required to blindly accept a state's assertion that its interests are enough to outweigh a burden . . . . [T]he sole evidence of the state's purported 'important law-enforcement investigatory function' is the short declaration of Lieutenant Logan. Yet the court is not required to take the state's conclusory assertions at face value simply because one veteran law enforcement officer describes the Witness Requirement as providing a 'significant' lead in fraud investigations." (Citations omitted.)); *Thomas*, ___ F. Supp. 3d at ___, 2020 WL 2617329, at *19–21, (quoting *Fish*'s rationale, the court found the state "ha[d] not offered any evidence of voter fraud in South Carolina other than SCEC's fleeting mention, during the May 15, 2020 hearing, of a voter-buying scandal from the 1980s" (footnote omitted)); *cf. Democracy N.C.*, ___ F. Supp. 3d at ___, 2020 WL 4484063, at *35–36 (weighing voter

witness requirement for absentee ballots under *Anderson–Burdick* analysis and distinguishing *Thomas v. Andino* based on evidence that "North Carolina experienced a serious case of voter fraud involving absentee ballots in the 2016 General Election with the Dowless Scheme" such that its "interest in preventing voter fraud is therefore not illusory or speculative").

While the majority cites *Crawford* as holding broadly that a state's interest in protecting the integrity of elections and preventing voter fraud are sufficient to support its voter identification law, the *Crawford* Court considered much more than a mere incantation of voter fraud than the defendant provides here. The Court considered specific evidence in the record to support Indiana's photo identification requirement, including evidence that Indiana's voter rolls were inflated as much as 41%, the voter registration totals in nineteen of Indiana's ninety-two counties exceeded 100% of their voting-age population, Indiana had "an unusually inflated list of registered voters," and Indiana had experience with fraudulent voting in the 2003 Democratic primary for East Chicago mayor. *Crawford*, 553 U.S. at 192, 195–96, 128 S. Ct. at 1617, 1619–20. Only after considering these specific facts did the Supreme Court conclude that Indiana's "interest in counting only the votes of eligible voters," coupled with "the interest in orderly administration and accurate recordkeeping provides a sufficient justification for carefully identifying all voters participating in the election process" through its photo identification requirement. *Id.* at 196, 128 S. Ct. at 1619. In comparison, the defendant's showing to justify changing the back-end correction procedures in section 53.2(4)(*b*) is utterly lacking.

**E. Our Resolution in *DSCC v. Pate* Does Not Preclude a Different Outcome.** Much of the defendant's argument and the majority's

reasoning focus on the front-end provisions of amended section 53.2(4)(*a*), which require the applicant to provide certain identifying information before receiving an absentee ballot by mail. *See* 2020 Iowa Acts ch. 1121, § 123 (to be codified at Iowa Code § 53.2(4)(*a*) (2021)). While we concluded that the front-end provisions fit within the state's legitimate interests without unduly burdening voter interests in *DSCC v. Pate*, ___ N.W.2d at ___, we are focused here on the back-end provisions addressing the process for correcting deficiencies in a request form once it is submitted to a county auditor. *See* 2020 Iowa Acts ch. 1121, § 124 (to be codified at Iowa Code § 53.2(4)(*b*) (2021)). We must address each regulations' burdens and justifications. *See Crawford*, 553 U.S. at 190, 128 S. Ct. at 1616 (holding courts do not "apply[] any 'litmus test' that would neatly separate valid from invalid restrictions" but instead "must identify and evaluate the interests put forward by the State as justifications for the burden imposed by its rule, and then make the 'hard judgment' that our adversary system demands").

As explained above, the plaintiffs have identified significant burdens on the ability of absentee voters to receive a timely ballot. The difference between the two cases is in the harm against which the state's interest must be weighed. In *DSCC v. Pate*, the plaintiffs challenged the denial of a request form with the identifying information prepopulated. The claimed harm stemmed largely from the fact that three county auditors sent prepopulated forms despite a directive not to, and the order directing them to contact those voters would result in confusion. *DSCC v. Pate*, ___ N.W.2d at ___. That harm arose not from the challenged legislation but from unauthorized actions by county auditors.

Here, the plaintiffs have presented evidence of significant harm stemming directly from the back-end procedures, the resulting delay, and

the likelihood that many voters will not receive their ballot. Against this heightened showing of harm made by plaintiffs in this case, the defendant presented no evidence of fraud to support the legislative change, choosing instead to rely on their rational-basis-level justification. The record is devoid of any suggestion that election integrity or voter fraud is, or has been, an issue. That the justification for the front-end provisions met the lesser burdens involved in *DSCC v. Pate* says nothing of whether the minimal justification offered for the back-end provisions meets the heightened burdens identified in this case.

**F. The Back-End Changes in Section 124 of HF 2643 Impose A Different Burden Than the Front-End Provisions.** The majority asserts as a further justification that the back-end provisions are needed to support the front-end provisions we upheld in *DSCC v. Pate* as a single-verification method. The front-end requirement for the applicant to provide their name, address, birthdate, and voter identification number "[a]rguably . . . help[ed] ensure that the person submitting the request is the actual voter," particularly when the state mailed an absentee ballot request form to every registered voter in the state. *DSCC v. Pate*, ___ N.W.2d at ___. Requiring the person signing the request form to provide the identifying information "arguably" serves that purpose, when such information would not be known by someone attempting to obtain another person's absentee ballot by submitting a false request form. Notably, to receive an absentee ballot, a voter must not only provide the requested information, but the voter must sign the request form under penalty of perjury and face criminal charges for forging another's signature on a ballot request form.

As addressed above, the back-end provisions provided by the legislature to correct errors in the front-end process burdens voting

because of the inherent delays it creates for a voter to receive an absentee ballot. That the direct burden is placed on the county auditors' offices does not negate the burden imposed on the voter waiting to receive their absentee ballot. *See, e.g.*, *Pa. Democratic Party*, ___ A.3d at ___, 2020 WL 5554644, at \*17 ("[T]he struggles of our most populous counties to avoid disenfranchising voters while processing the overwhelming number of pandemic-fueled mail-in ballot applications during the 2020 Primary demonstrates that orderly and efficient election processes are essential to safeguarding the right to vote.").

Additionally, the majority's claim that the front-end process is meaningless without the back-end corrections ignores the record evidence that county auditors use the I-Voters database to make corrections only when the application contains sufficient other identifying information to ensure it is the correct person. The evidence shows the most common errors are transposed numbers in birthdates and missing voter ID numbers. This leaves sufficient other identifying information completed by the applicant to efficiently, and accurately, use the I-Voters database as it has been used for decades. The majority's list of imagined concerns does not negate this evidence.

Finally, the majority fails to address that the back-end correction procedures required by the legislation are ineffective in furthering that same general goal, as recognized by the county auditors who use the system. An applicant for an absentee ballot who does not have access to their voter identification number may call the county auditor and receive the number over the phone by simply verifying two identifying facts about the applicant, including the applicant's birthdate, last four digits of their social security number, residential or mailing address, or middle name. *See* Iowa Code § 53.2(4)(*d*). These are facts the county auditor would know

only by accessing the I-Voters database. So a county auditor can use the I-Voters database to provide a voter their voter ID number over the phone if the voter verifies two pieces of identifying information from the I-Voters database, but the county auditor cannot use that same I-Voters database to correct a missing or inaccurate voter ID number from a written request form that contains that same identifying information.

As Professor Hersh recognized, this process completely nullifies the effectiveness of the back-end procedures to protect against absentee ballot identification fraud, particularly in light of the front-end changes precluding use of prepopulated application forms. Whereas the prepopulated forms did provide two of the pieces of information that would have allowed anyone who had possession of the request form to call and obtain another person's voter ID number, the front-end changes took care of that. Now, a person in possession of another person's application form would not be informed of anything other than the person's name and the mailing address used to mail the application form, which is insufficient to satisfy the requirements for obtaining the voter identification number through the section 53.2(4)(*d*) process. *See* Iowa Code § 53.2(4)(*d*). Coupled with the fact that an applicant can call the auditor's office and receive the missing information over the phone by providing the same information included on the request form, the cumbersome communication scheme does little to forward the vague justification advanced by the state.

**G. Balancing Under *Anderson–Burdick*.** This case really comes down to whether the state's hollow justification for imposing a more cumbersome process for curing defects in absentee ballot requests justifies the resulting burden on voters' rights, particularly when considered in the midst of the COVID-19 pandemic. As I balance the competing concerns in

light of the evidence presented, I do not believe it does.  *See, e.g., Ne. Ohio Coal. for the Homeless*, 837 F.3d at 632 (recognizing hundreds of "identifiable voters may be disenfranchised based only on a technicality" and holding that while the burden of requiring exact compliance with address and birthdate fields was slight, none of the "precise interests" of the state justified the burden (second quoting *Burdick*, 504 U.S. at 434, 112 S. Ct. at 2063)); *see also Ohio State Conf. of NAACP v. Husted*, 768 F.3d 524, 541 (6th Cir. 2014) (recognizing under *Anderson–Burdick* that a challenged law may be unconstitutional even if it "does not absolutely prohibit early voters from voting," if the "evidence in the record" shows "that the plaintiffs' 'ability to cast a ballot is impeded by [the state's] statutory scheme.' ") (first and third quoting *Obama for Am. v. Husted*, 697 F.3d 423, 433 (6th Cir. 2012), second quoting *id.* at 431), *vacated on other grounds*, No. 14-3877, 2014 WL 10384647 (6th Cir. Oct. 1, 2014).

Having determined the plaintiffs have shown a likelihood of success on the merits, I conclude the plaintiffs are entitled to a temporary injunction.  The plaintiffs have established HF 2643 invades Iowans' fundamental right to vote by placing a burden on that right without a commensurate justification for that burden.  Substantial injury will result because tens of thousands of Iowans will likely no longer be able to cast their votes safely as a result of HF 2643.  Additionally, enjoining the Secretary of State from enforcing HF 2643 is the only way to adequately protect the rights placed at risk.

**IV.  Nonissues.**

Two final points.  I reject the argument that we would be creating more confusion than we would be alleviating.  The process at issue involves the internal, or back-end, process used by county auditors to correct incomplete or inaccurate absentee ballot request forms.  Under the prior

process, a county auditor who received a deficient request form could correct the error internally if they had sufficient information to identify the individual in the I-Voters database. The county auditor could then mail the ballot to the applicant, who would have been unaware of the deficiencies. Under the new process, the county auditor must contact the applicant, via phone, email, or letter, to obtain the missing or inaccurate information before the auditor can mail the ballot to the applicant. The relief requested by the plaintiffs would return the process to the prior internal process, such that no voters would be aware of the corrections made.

I also reject the majority's position that we should not change election rules this close to the election. To the extent the *Purcell* principles, *see Purcell v. Gonzalez,* 549 U.S. 1, 4–5, 127 S. Ct. 5, 7–8 (2006), even apply to state courts addressing challenges to their state's election laws under their own constitutions, *cf. DSCC v. Pate,* ___ N.W. 2d ___ (Appel, J., concurring specially), granting the requested injunction under the unique circumstances of this case would actually lessen confusion and lessen administrative burdens on election officials, both without affecting any voters' rights. *Cf. Purcell,* 549 U.S. at 4–5, 127 S. Ct. at 7 (emphasizing voter confusion and burdens on state election administrators).

A temporary injunction would have no adverse effects on voters, who will be none the wiser about the behind-the-scenes process. It likewise would have no effect on any applicants who have already submitted a request form, as it will merely allow the county auditors to more quickly process their request. Behind the scenes, the county auditors would be freed from the cumbersome communication requirements and would be able to more quickly process the tens of thousands of request forms they continue to process through the impending election, thus helping assure

all applicants, not just ones with deficient applications, timely receive absentee ballots in time for their vote to count. *Purcell* principles do not preclude us from entering a temporary injunction.

For these reasons, I respectfully dissent.

Christensen, C.J., and Appel, J., join this dissent.